## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DWAYNE ACKIE,

*Plaintiff,*

v.

PHILADELPHIA GAS WORKS, et al.,

*Defendants.*

CIVIL ACTION
NO. 19-4275

WAYNE RAUCEO,

*Plaintiff,*

v.

PHILADELPHIA GAS WORKS,

*Defendant.*

CIVIL ACTION
NO. 19-4279

MIGUEL J. CHAVARRIA, JR.,

*Plaintiff,*

v.

PHILADELPHIA GAS WORKS, et al.,

*Defendants.*

CIVIL ACTION
NO. 19-4428

MAURICE A. GOODWIN,

*Plaintiff,*

v.

PHILADELPHIA GAS WORKS, et al.,

*Defendants.*

CIVIL ACTION
NO. 19-4429

**PAPPERT, J.**                                                      **June 10, 2021**

<u>**MEMORANDUM**</u>

These are four related cases brought by co-workers at the Philadelphia Gas

Works plant on Passyunk Avenue.  They emanate from an internal complaint Miguel

1

Chavarria filed with PGW's Human Resources Department about what he felt was a racially discriminatory environment at the Passyunk Plant. Wayne Rauceo, Maurice Goodwin and Dwayne Ackie, in addition to having some of their own concerns about the workplace, each participated in PGW's investigation into Chavarria's complaint. They believe they were retaliated against for doing so. They all sued PGW for discrimination, retaliation and fostering a hostile work environment. Chavarria, Goodwin and Ackie are members of the Gas Works Employees' Union Local 686 and they sued the union as well.

PGW and Local 686 move for summary judgment on all claims. After considering the parties' filings, thoroughly reviewing the record evidence in each case and holding oral argument, the Court grants all Motions in full. None of the Plaintiffs can establish a *prima facie* case for any of their claims because they did not suffer an adverse employment action or intentional discrimination, much less endure any discrimination that was severe or pervasive.

The Plaintiffs are all represented by Karin Gunter, who saw many of her clients' claims implode at oral argument when she had no alternative but to either withdraw them or concede that the Defendants were entitled to judgment in their favor. Not only is there no support in the record for the claims in these lawsuits, some allegations were directly contradicted by her clients' own deposition testimony. Counsel needed to vet her clients' claims more fully or at some point realize that discretion is the better part of valor.

I

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). The movant bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004), holding modified by *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under the governing law. *Id.* A mere scintilla of evidence supporting the nonmoving party will not suffice for a court to deny summary judgment. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing there is a genuine issue for trial." *Id.* at 256.

At summary judgment, a court may consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387–88 & n.13 (3d Cir. 1999). In doing so, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009) (citation and quotation marks omitted). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621

F.3d 249, 252 (3d Cir. 2010).  Nor may a court make credibility determinations or weigh the evidence.  *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

## II

Title VII and the PHRA prohibit employers from discriminating against employees with respect to the terms, conditions or privileges of employment because of their race, color or national origin.  *See* 42 U.S.C. § 2000e-2(a); 43 P.S. § 955(a).  The ADEA precludes employer discrimination against employees in similar respects because of their age.  *See* 29 U.S.C. § 623(a)(1).  Analyses of Title VII and PHRA violations are "identical, as Pennsylvania courts have construed the protections of the two acts interchangeably."  *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001)); *see also Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).  Further, "[b]ecause the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to the prohibition against discrimination contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under the ADEA."  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 191, 192–93 (3d Cir. 2015) (quoting *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 698 (3d Cir. 1995)).

## A

Disparate treatment claims under Title VII, the PHRA and the ADEA are governed by the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981); *see also Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (collecting

cases).  To establish a *prima facie* case for disparate treatment against an employer under Title VII or the PHRA, a plaintiff must show: (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination.  *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  To establish a *prima facie* case under the ADEA, a plaintiff must show he "(1) . . . was over forty; (2) was qualified for the position at issue; (3) suffered an adverse employment action; and (4) was ultimately replaced, or the position was filled by, a younger person." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 973–74 (3d Cir. 1998).  An adverse employment action is one "that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019) (quoting *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015)).  "[G]eneral unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial animus," is insufficient to support a disparate treatment claim.  *Barnes v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015).

Once a plaintiff establishes a *prima facie* case, "the burden of production . . . shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Burton*, 707 F.3d at 426 (quoting *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009)).  "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)); *see also*

*Shellenberger v. Summit Bancorp*, 318 F.3d 183, 189 (3d Cir. 2003) (at the summary judgment stage "the defendant need not prove that the articulated reason actually motivated the action") (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997)).  If an employer provides a sufficient justification, the burden shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination."  *Burton*, 707 F.3d at 426.  To show pretext, a plaintiff "must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Id.* at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 763, 764 (3d Cir. 1994)).

i

Where a plaintiff asserts a disparate treatment claim against a union, to establish a *prima facie* case "a plaintiff must show (1) a violation of the collective bargaining agreement with respect to the plaintiff; (2) the union permitted the violation to go unaddressed, thereby breaching its duty of fair representation; and (3) some indication that the union's actions were motivated by some discriminatory animus."  *Jenkins v. Transp. Workers Union, Loc. 234*, No. 19-cv-1904, 2019 WL 6219211, at *3 (E.D. Pa. Nov. 21, 2019) (quoting *Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 371 (E.D. Pa. 2015)).  A union can breach its duty of fair representation "if its actions are 'arbitrary, discriminatory, or in bad faith,'" and its actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational."  *Danao*,

142 F. Supp. 3d at 371 (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)).  "The deliberate choice not to process grievances' can, under certain circumstances, violate Title VII." *Danao*, 142 F. Supp. 3d at 371 (quoting *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 127 (3d Cir. 1985)).

A plaintiff "must adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives" to show a union's conduct was discriminatory. *Bakos v. Airlines, Inc.*, 748 F. App'x 468, 472 (3d Cir. 2018)) (citation and quotation marks omitted).  He must also "show that 'the breach directly cause[d] damage to an individual or group to whom the duty is owed.'" *Id.* (citation omitted).

## B

The *McDonnell Douglas* burden shifting framework also governs Title VII, PHRA and ADEA retaliation claims in the absence of direct evidence of retaliation. *See Daniels*, 779 F.3d at 192–93.  To establish a *prima facie* case for retaliation, a plaintiff must show (1) he engaged in protected activity; (2) the defendant took an adverse employment action against him; and (3) there was a causal connection between his protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006).  "To establish protected activity, the plaintiff must establish that he 'opposed conduct that a reasonable person could believe violated Title VII's standard for unlawful discrimination.'" *Dykes v. Marco Group, Inc.*, 222 F. Supp. 3d 418, 431 (E.D. Pa. 2016).  In the retaliation context, an employment action is materially adverse if "it might well have dissuaded a reasonable

worker from making or supporting a charge of discrimination." *Burlington N. & S.F. Ry. v. White*, 548 U.S. 53, 68 (2006).

At the *prima facie stage*, a plaintiff "must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Cavalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (quoting *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (emphasis added)). "[A] plaintiff may rely on 'a broad array of evidence' to demonstrate the causal link between [the] protected activity and the adverse [employment] action taken." *Id.* at 260 (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). This may include evidence of "an employer's inconsistent explanation for taking an adverse employment action, . . . a pattern of antagonism . . . or temporal proximity unusually suggestive of retaliatory motive." *Id.* (internal quotations and citations omitted).

If a plaintiff meets the *prima facie* case requirements, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Moore*, 461 F.3d at 342 (citation and quotation marks omitted). If the employer satisfies that burden, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (citation and quotation marks omitted). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). A plaintiff asserting a retaliation claim "has a higher causal burden than a plaintiff asserting a claim of direct status-based

discrimination under Title VII" and must ultimately "prove that retaliatory animus was the 'but-for' cause of the adverse employment action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017) (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

C

Hostile work environment claims are not subject to the *McDonnell Douglas* framework because "there can be no legitimate justification for a hostile work environment." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017). To succeed on a hostile work environment claim against an employer, a plaintiff must establish (1) he suffered intentional discrimination because of his race, color or national origin; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017)); *see also Slater v. Susquehanna Cty.*, 465 F. App'x 132, 138 (3d Cir. 2012) ("We assume, without deciding, that the ADEA makes available a hostile work environment claim for age-based discrimination, analyzed under the same standards as a Title VII hostile work environment claim.") (citing *Brennan v. Metropolitan Opera Ass'n Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996)).

Discriminatory conduct "must be extreme to amount to a change in the terms and conditions of employment" to be considered severe or pervasive, *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524

U.S. 775, 788 (1998)), and a work environment "must be objectively hostile, not just hostile in the plaintiff's view," *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014).  Courts consider the "totality of the circumstances" in determining whether "the conduct at issue is sufficiently extreme" to support a hostile work environment claim, which "'may include the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Caver*, 420 F.3d at 262–63 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "'[O]ffhanded comments[] and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Id.* (quoting *Faragher*, 524 U.S. at 788).

Employer liability for conduct creating a hostile work environment varies based on a plaintiff's claims.  Where a plaintiff claims a supervisor is responsible for harassing conduct, an employer is "strictly liable for [the] supervisor's actions '[i]f the . . . harassment culminates in a tangible employment action.'" *In re Tribune Media Co.*, 902 F.3d at 399 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).  A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassign[ing] with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 399–400 (citation and quotation marks omitted) (alteration in original).  "[I]f no tangible employment action is taken," an employer may escape liability for a supervisor's conduct "by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff

unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 570 U.S. at 424 (citations omitted).

Where a plaintiff claims a co-worker is responsible for harassing conduct, "employer liability . . . exists only if [(1)] the employer failed to provide a reasonable avenue for complaint or . . . [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Tribune*, 902 F.3d at 400 (quoting *Huston*, 568 F.3d at 104). An employer "knew or should have known about . . . harassment if 'management-level employees had actual or constructive knowledge about the existence of a . . . hostile environment.'" *Huston*, 568 F.3d at 105 (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1486 (3d Cir. 1990) (emphasis removed)).

i

To succeed on a hostile work environment claim against his union, a plaintiff must show: "(1) he was subjected to a hostile work environment; (2) he requested action on the part of the union; and (3) the union ignored his request for action." *Robinson v. Nat'l R.R. Passenger Corp.*, No. 18-cv-341, 2019 WL 3310333, at *22 (E.D. Pa. July 22, 2019).

III

A

Miguel Chavarria is a black African American of Costa Rican descent. (Chavarria Ex. 1, Chavarria Dep. Tr. 12:23–14: 11, ECF 60-5.) He is a PGW Working Foreman and Local 686 member. (PGW Chavarria Stmt. of Undisputed Material Facts ("SUMF") ¶¶ 3–4, ECF 52-2.) Chavarria believes the Passyunk Plant "got really racial"

after Brian McGuire, a white man of Irish and Italian descent, (PGW Chavarria Ex. F, McGuire Dep. Tr. 46:2–9, ECF 52-3), became Plant Manager in May of 2015, and he feels Hispanic General Supervisor David Martinez, (PGW Chavarria Ex. I, Martinez Dep. Tr. 49:14–21, ECF 52-4), has facilitated a discriminatory environment.  *See* (PGW Chavarria SUMF ¶ 14); (Chavarria Ex. 1 at 59:7–18); (PGW Chavarria Ex. U, Chavarria Internal Complaint).

In December of 2017, Chavarria submitted an internal complaint to human resources alleging "continued and intensifying" race, color and national origin bias and intimidation directed at "employees of African American, African[] or brown skinned lineage" at the Passyunk Plant, claiming the Plant was "divided by race and color . . . the white and Puerto Rican employees against the African American, brown employees," and stating decisions at the Plant "will usually be to the detriment of [African American], brown employees."  (PGW Chavarria Ex. U.)  Both PGW and outside counsel investigated these allegations, including by interviewing Chavarria and other Passyunk Plant employees, but were unable to corroborate them.  *See* (Chavarria Ex. 14, Rohrer Internal Investigation Summary Report); (PGW Chavarria SUMF ¶ 99); (PGW Chavarria Ex. T, Outside Counsel Investigation); (PGW Chavarria Ex. DD, Letter to Chavarria).

After PGW informed Chavarria of its investigation findings, Chavarria filed charges with the EEOC and PHRC on August 9, 2018 claiming "McGuire and Martinez created and continue[] to create a hostile work environment segregated by race, national origin, color and gender" and asserting he has been subjected to retaliation, disparate treatment, a hostile work environment and policies and practices having a

disparate impact on employees at the Passyunk Plant.  *See* (PGW Chavarria Ex. GG, EEOC Charge, ECF 52-5).  The EEOC responded to the charge on July 1, 2019 stating, *inter alia*, it found "no evidence to show" Chavarria was treated unfavorably by PGW because of his race, color or national origin or subjected to an adverse employment action after he engaged in protected activity.  (PGW Chavarria Ex. HH, EEOC Letter).

Chavarria now sues PGW for discrimination, retaliation and hostile work environment.  *See* (Chavarria Am. Compl. ¶¶ 16–59, ECF 8).[1]  He cites, in purported support of his claims, several Passyunk Plant experiences he found upsetting before and after he made his 2017 internal complaint.

With respect to experiences that preceded his complaint, first, Chavarria claims McGuire once called him a mutt, though McGuire denies this.  (Chavarria SUMF ¶¶ 3–4, ECF 60-3); (Chavarria Ex. 1 at 18:2–15).  Second, during the summer of 2017 a less senior Caucasian employee received a vacation day Chavarria requested first even though PGW typically grants vacation based on seniority.  (Chavarria Resp. to PGW SUMF ¶ 33, ECF 60-2.)  PGW explains this was inadvertent, and Chavarria acknowledges that he received the day off once he reported the issue to Local 686 and management became aware of the mistake.  (PGW Chavarria SUMF ¶¶ 33–36); (Chavarria Resp. to PGW SUMF ¶ 33.)  Third, on one occasion Chavarria was asked to decline insufficient notice pay for an abrupt schedule change or else lose overtime, but McGuire promptly rectified this.  *See* (Chavarria Resp. to PGW SUMF ¶ 37); (Chavarria Ex. 1 at 72:21–23); (PGW Chavarria SUMF ¶ 37).  Fourth, in December of 2017

---

[1]       Chavarria also sued Local 686, but at oral argument his lawyer withdrew his claims against the union.  *See* (May 27, 2021 Hr'g Tr. 111:12–113:15).  Specifically, she agreed the Court should grant Local 686's Motion for Summary Judgment (ECF 51) "[b]ased on [Chavarria's] deposition testimony . . . because he pretty much conceded . . . all the points."  (May 27, 2021 Hr'g Tr. 113:3–15.)

Chavarria was scheduled to work more consecutive days than others.[2]  (PGW Chavarria Ex. A, Chavarria Dep. Tr. 119:14–25, 120:1–4.)

Fifth, in November and December of 2017 Chavarria was assigned to an LNG truck unloading project for six days, more than less senior Plant Process Operators who typically handle unloading and more than a Caucasian Working Foreman who had only recently been promoted. (Chavarria Resp. to PGW SUMF ¶¶ 41, 43.)  He claims African Americans were generally assigned outside work on the project while Caucasian and Hispanic employees received inside assignments. (Chavarria Ex. 1 at 24:1–6.)  PGW claims it had to offer Chavarria more unloading work because it allowed him to earn overtime and PGW is obligated to distribute overtime "as equitably as is possible" among union personnel.  (PGW Chavarria SUMF ¶¶ 27, 45); (Chavarria Ex. 2, PGW and Local 686 Agreement).  Chavarria had accrued less overtime than others at the time, and he could have refused the overtime if he wanted.  (PGW Chavarria SUMF ¶ 47); (PGW Chavarria Ex. O, Overtime Accruals).  Moreover, truck unloading is part of a Working Foreman's job description.  *See* (Chavarria Ex. 9, Working Foreman Job Description).

With respect to his experiences after filing his internal complaint, Chavarria says "racial tensions just got really bad overall . . . between union people" and "all of the white union people [he] worked with . . . stopped speaking to" him. (Chavarria Ex. 1 at 69:10–70:4.)  He also believes he was targeted in some form after he complained about race, color or national origin discrimination to human resources and outside counsel.

---

[2]      Chavarria claims a Caucasian Working Foreman and a Hispanic Working Foreman received more days off than him in December of 2017, but he cites no record evidence to support this.  *See* (Resp. to Mot. for Summary Judgment 16, ECF 60-1).

Specifically, at one point during outside counsel's investigation, two signs saying "The Rat Pack" were discovered at the Plant, one in the front office and another in a toolbox in the boiler room. (*Id.* at 125:14–128:16); (Chavarria Resp. to PGW SUMF ¶ 95). Chavarria found the sign in the front office. (Chavarria Resp. to PGW SUMF ¶ 95). PGW senior management investigated this incident and told Plant employees the sign creator would be disciplined "possibly severely," and the signs never returned. (PGW Chavarria SUMF ¶¶ 97–98.) Further, during 2018, Chavarria believes McGuire stalked him at work because he "came into [his] workspace . . . just searching through the building while [he was] working." (Chavarria Resp. to PGW SUMF ¶ 83); (Chavarria Ex. 1 at 111:5–113:14, 239:25–240:6.)[3]

i

Despite Chavarria's laundry list of complaints, nothing he alleges rises to the level of disparate treatment, retaliation or a hostile work environment under Title VII

---

[3]    Chavarria also complains about two 2018 policy changes at the Plant, but neither were specifically directed at him or could conceivably support his claims. First, PGW restricted union personnel's use of the Plant truck in a way that Chavarria says disproportionately affected "African American, brown and/or black" employees, *see* (PGW Chavarria SUMF ¶ 78); (Chavarria Resp. to PGW SUMF ¶ 79), but Working Foremen "don't use the vehicle for their jobs," (May 27, 2021 Hr'g Tr. 177:5–8). Second, PGW restricted employees' use of personal electronic devices, (Chavarria Ex. 1 at 122:23–124:12), but that policy "appl[ied] to employees of all . . . races and colors," (May 27, 2021 Hr'g Tr. 118:6–13). Chavarria claims McGuire allowed a Hispanic employee to use a personal boombox despite the policy. (Chavarria Ex. 1 at 124:13–25.) Even assuming that is true, nothing in the record explains the circumstances surrounding that exception.

Chavarria further alleges he and others experienced maltreatment after the EEOC investigated his charge, but PGW argues the Court cannot consider those allegations because Chavarria has failed to exhaust his administrative remedies for them. *See* (Mot. for Summary Judgment Chavarria 3–5, ECF 62); *Crumpton v. Potter*, 305 F. Supp. 2d 465, 76 (E.D. Pa. 2004); *Ryan v. Gen. Mach. Prods.*, 277 F. Supp. 3d 585, 594 (E.D. Pa. 2003). PGW is correct, and the Court did not consider those events in deciding PGW's Motion. Even if it had, however, the Court agrees with PGW that "none of [the] alleged events . . . even support [Chavarria's] claims or would otherwise be sufficient to withstand PGW's Motion for Summary Judgment." (Mot. for Summary Judgment Chavarria 5.)

or the PHRA.  His disparate treatment claim fails at the outset because "nothing actionable happened" to him.  (May 27, 2021 Hr'g Tr. 93:6–7.)  He argues the vacation day mix-up, his LNG truck unloading assignment and receipt of less time off than others in December of 2017 were adverse employment actions supporting disparate treatment, *see* (Resp. to Mot. for Summary Judgment 16); (May 27, 2021 Hr'g Tr. 144:16–145:7), but none of these events altered the terms, conditions or privileges of his employment.  First of all, he admits PGW corrected its mistake and he received the vacation day he wanted.  Next the truck unloading assignment and his 2017 schedule were squarely within the terms of his employment—LNG unloading is explicitly part of his job description, *see* (Chavarria Ex. 9), and PGW's agreement with Local 686 gives management the right to assign loading and unloading, and set employee schedules generally, at its discretion, *see* (PGW Chavarria Ex. G); (Local 686 Chavarria Ex. B, Gaydosh Dep. Tr. 63:10–13, 139:7–12, ECF 51-4); (Local 686 Chavarria Ex. F., Grievance Report, ECF 51-9).

ii

Chavarria cannot succeed on his retaliation claim either.  He and PGW agree he engaged in protected activity when he submitted his internal complaint and interviewed with human resources about it as well as when he participated in outside counsel's investigation.  (Mot. for Summary Judgment Chavarria 16, ECF 52-1); (May 27, 2017 Hr'g Tr. 137:21–138:1.).  Chavarria further claims his complaint to Local 686 about the vacation day error constitutes protected activity, but the evidence fails to show that incident was one "a reasonable person could believe violated Title VII's

standard for unlawful discrimination." *Dykes*, 222 F. Supp. 3d at 431; *see also* (May 27, 2017 Hr'g Tr. 102:8–20).

Notwithstanding Chavarria's engagement in some protected activities, he was not subjected to anything that can even be remotely defined as a retaliatory adverse employment action.  When the Court defined "adverse employment action" in the retaliation context at oral argument, counsel acknowledged "the only thing we have of record" fitting the definition is Chavarria's claim that McGuire stalked him.  (May 27, 2021 Hr'g Tr. 139:5–142:13.)  But Chavarria's belief that McGuire came into his workspace and/or searched the building while he was working is insufficient to support his claim because "simply being observed at work, without more, does not rise to the level of an adverse employment action." *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 414 (E.D. Pa. 2000), *aff'd* 29 F. App'x 100 (3d Cir. 2002); *see also Buffa v. N.J. State Dep't of Judiciary*, 56 F. App'x 571, 576 (3d Cir. 2003) (finding "intense scrutiny and overly-critical supervision" did not amount to adverse employment actions for retaliation claim); *Huggins v. Coatesville Area School Dist., et al.*, Nos. 07-4917, 09-1309, 2010 WL 4273317, at *10 n.25 (E.D. Pa. Oct. 29, 2010) ("It is well-settled that being closely supervised or 'watched' [by a supervisor] does not constitute an adverse employment action . . . ") (internal quotations and citation omitted).  And even if it did, nothing in the record shows any causal connection between Chavarria's protected activity and McGuire's supervision.  *Cf.* (May 27, 2021 Hr'g Tr. 142:17–143:17 (counsel acknowledging Chavarria is "unclear" about when he was purportedly stalked relative to his protected activity)).

In any event, PGW explains Senior Management instructed McGuire to "tighten things up" at the Plant following Chavarria's complaint because during PGW's investigation it discovered Plant employees were potentially violating Plant timekeeping and/or security policies. *See* (PGW Chavarria Ex. H, Answers to Ackie Interrogatories 3–5); (PGW Chavarria Ex. F, McGuire Dep. Tr. 134:20–135:13). This was why McGuire increased his supervision, and Chavarria offers no evidence which could show that this non-retaliatory explanation was pretextual.[4]

iii

The evidence also fails to support Chavarria's hostile work environment claim. As an initial matter, Chavarria has not shown how most of his experiences constituted intentional race, color or national origin-based discrimination. At oral argument his attorney suggested intentional discrimination could be inferred from the totality of the circumstances, *see* (May 27, 2017 Hr'g Tr. 119:18–24, 121:7–13, 126:22–127:6), but the Court fails to see how. There is nothing showing that the mix-up on the vacation day was intentional, and Chavarria has not shown that the "Rat Pack" signage or McGuire's alleged "mutt" comment, both of which have several possible meanings, were intended to address his race, color or national origin. He also fails to explain how McGuire

---

[4]     In Response to PGW's Motion, Chavarria also identified his LNG truck unloading assignment, the "Rat Pack" sign posting and racial tensions at the Passyunk Plant as the retaliatory adverse employment actions he experienced. (Resp. to Mot. for Summary Judgment 15–16). None of these constitute adverse employment actions in the retaliation context. Chavarria's allegations of racial tensions at the Plant are conclusory assertions lacking specificity and "unnecessary derogatory comments" do not suffice as adverse employment actions. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997); *see also Kidd v. Pennsylvania*, 37 F. App'x 588, 591 (3d Cir. 2002) (no adverse employment action suffered by plaintiff called a "Judas" and a "rat"). Additionally, since Chavarria's complaint to Local 686 about his vacation was not protected activity, the record shows no protected activities preceded his truck unloading assignment. Even if the assignment followed protected activity, nothing about an employee being asked to complete one of his job responsibilities would "dissuad[e] a reasonable worker from making or supporting a charge of discrimination." *Daniels*, 776 F.3d at 195.

"stalking" him was discriminatory and based on his race, color or national origin. Counsel admits there is "no . . . direct evidence on the record" showing Chavarria was asked to decline insufficient notice pay because of his race, color or national origin and states Chavarria's basis for this claim is that "no one else, to his knowledge or of record, had been asked to do that and he was." (May 27, 2017 Hr'g Tr. 119:3–11.) And with respect to his LNG truck unloading assignment, the record shows, and his lawyer agrees, that much of Chavarria's discontentment was driven by his belief that it "was not a foreman job." *See, e.g.*, (Chavarria Ex. 1 at 29:24–30:12 (acknowledging initial complaint about assignment expressed this and did not address race, color or national origin)); (May 27, 2021 Hr'g Tr. 122:17–124:10) (explaining Chavarria believes Ackie and Goodwin, also African Americans, should have been assigned the unloading work because they hold more junior PGW positions)); (Chavarria Ex. 1 at 30:24–31:10) (same).

Even assuming what Chavarria experienced was intentional discriminatory conduct, it does not rise to the level of severe or pervasive because it "is not enough for a trier of fact to conclude that discriminatory conduct in the workplace amounted to a change in the terms and conditions of [Chavarria's] employment." *Woodard v. PHB Die Casting*, 255 F. App'x 608, 610 (3d Cir. 2007) (per curiam) (KKK-related graffiti in office bathroom for over three months and numerous racially insensitive comments directed at plaintiff not severe or pervasive); *King v. City of Phila.*, 66 F. App'x 300, 305 (3d Cir. 2003) (plaintiff subjected to racial epithet, physically pushed and threatened that work would be sabotaged did not experience severe or pervasive conduct). Moreover, counsel did not argue PGW's alleged conduct was pervasive and agreed assigning someone to

perform work within their job description is not "severe" as the Third Circuit defines it.
*See* (May 27, 2021 Hr'g Tr. 128:14–130:5).

On this record, no reasonable jury could return a verdict for Chavarria with
respect to any of his claims.

B

Wayne Rauceo is a 53-year-old brown-skinned African American of Trinidadian
descent. (Rauceo Ex. 1, Rauceo Dep. Tr. 11:19–25, ECF 45-3.)  He works as a Gas
Processing Operations Supervisor, a management-level position at PGW.  (PGW Rauceo
SUMF ¶¶ 4, 6, ECF 38-2.)  Rauceo alleges against PGW disparate treatment,
retaliation and hostile work environment claims.  *See* (Rauceo Sec. Am. Compl. ¶¶ 15–
91, ECF 14).  He believes he has been treated unfairly at PGW because of his race,
color, national origin and/or age.[5]

Rauceo claims during the fall of 2017 non-African American employees were
given overtime opportunities not offered to him.  In September of 2017, Martinez
assigned only himself, Ryan O'Donnell and John Mullin, two white employees, to work
on a short-term pipeline project that occurs once every ten years, and O'Donnell earned
overtime for this work.  (PGW Rauceo SUMF ¶¶ 23–24, 28–30).  In November,
Martinez did not schedule any African American, brown and black supervisors to work
overtime on the LNG truck unloading project.  (Rauceo Ex. 1-A, Rauceo Dep. Tr. 57:14–
58:3, ECF 46-2.)  Martinez explains he assigned O'Donnell and Mullin to the pipeline

---

[5]     Rauceo's sole basis for claiming age-based discrimination appears to be that he did not
receive a promotion that instead went to Martinez, who is younger than him.  *See* (Rauceo SUMF
¶¶ 1–22, ECF 45-2); (Resp. to Mot. for Summary Judgment 6–7, ECF 46).  The Court previously
found this allegation is time-barred, (March 24, 2020 Order, ECF 18), and counsel admitted at oral
argument that Rauceo cannot rely on this event to support any age-based claims, (May 27, 2021 Hr'g
Tr. 209:20–25).  He thus cannot succeed on any of his claims under the ADEA.

project because he was with them when he was instructed on it.  (PGW Rauceo SUMF ¶¶ 28–29.)  Rauceo earned more overtime than any other Operations Supervisor in 2017 and 2018 notwithstanding these projects.  (*Id.* at ¶ 18); (PGW Ex. F, Management Overtime Report, ECF 38-4).

Rauceo also participated in PGW and outside counsel's investigations following Chavarria's internal complaint and believes he has been retaliated against for doing so. He found the "Rat Pack" sign in the toolbox at the Passyunk Plant and believes it was directed at him and "all the other brown skin African American brothers."  (Rauceo Resp. to PGW SUMF ¶¶ 49–50, ECF 45-1); (Rauceo Ex. 1 at 105:25–107:22).  He was never called a rat directly, and he did not observe anyone else being called a rat. (Rauceo Ex. 1 at 113:2–4, 114:24–115:22.)  He also says "tensions" developed between non-minority and minority employees at the Plant during outside counsel's investigation.  (Rauceo Resp. to PGW SUMF ¶ 57.)  PGW addressed the tensions by hiring a third party vendor to facilitate discussions about diversity, inclusion and equity at the Plant "with a goal of reparation" as well as an individual coach for McGuire "to 'rectify' the situation and morale at the Plant as a condition to keeping his job."  (*Id.*)

Rauceo further believes he was retaliated against when he declined four hours of overtime while at home in February of 2018 because Martinez recorded the declination as an "overtime refusal."  (Rauceo Resp. to PGW SUMF ¶ 20); (PGW Rauceo SUMF ¶ 20.)  According to Rauceo, the documentation of his refusal was inconsistent with PGW policy that an overtime refusal only occurs when an employee declines overtime while at work.  (Rauceo Resp. to PGW SUMF ¶ 20); (Rauceo Ex. 1 at 76:10–18.)  It was

also inconsistent with Martinez's practices at the time, because Martinez did not begin formally documenting all Operations Supervisors' overtime refusals until late April of 2018. (Rauceo Resp. to PGW SUMF ¶ 19); (PGW Rauceo SUMF ¶ 21.) Even if inappropriate, however, documenting the "overtime refusal" had no effect on Rauceo's employment. (May 27, 2021 Hr'g Tr. 210:18–25.) Indeed, Operations Supervisors cannot be disciplined for refusing overtime. (PGW Rauceo SUMF ¶ 22); (Rauceo Ex. 7, Martinez Dep. Tr. 221:23–222:2.)[6]

i

At oral argument, Rauceo's attorney admitted her client did not, in general or as a result of engaging in protected activity, suffer any adverse employment action that altered the terms, conditions or privileges of his employment or would have dissuaded a reasonable worker from supporting a charge of discrimination. *See* (May 27, 2021 Hr'g Tr. 212:14–23, 219:10–22). She agreed the Court should enter judgment in PGW's favor on Rauceo's disparate treatment and retaliation claims, (*id.* at 212:20–23; 219:23–220:2), leaving hostile work environment Rauceo's only remaining claim against PGW.

According to counsel, the record evidence purportedly showing that Rauceo faced intentional discrimination is Chavarria's testimony that Rauceo is ignored, "given a

---

[6]     Rauceo filed a charge with the EEOC on August 2, 2018 alleging retaliation, hostile work environment, disparate treatment and disparate impact, *see generally* (PGW Rauceo Ex. X, EEOC Charge, ECF 38-5), and received a letter from the EEOC on June 24, 2019 saying it found no evidence he was treated unfavorably because of his race, color, age or national origin, (PGW Rauceo Ex. Y, EEOC Letter).  Like Chavarria, Rauceo tries to bolster his claims against PGW by introducing evidence of events that occurred long after the EEOC's letter, including events that post-date the close of discovery in this case.  *See, e.g.*, (Rauceo Resp. to PGW SUMF ¶ 59); (Rauceo Ex. 3, Rauceo Aff. ¶¶ 4, 6–7); (Rauceo Ex. 18, January 2021 Ackie and PGW Emails); (Rauceo Resp. to Mot. for Summary Judgment 5–6).  PGW again correctly asserts Rauceo cannot pursue allegations relating to these claims in this litigation because he failed to exhaust administrative remedies for them.  (PGW Rauceo Reply 3–5, ECF 47).  Moreover, as in Chavarria's case, none of the recent events Rauceo alleges support his claims that he personally experienced disparate treatment, retaliation or a hostile work environment.

hard time" and "treated differently" than other supervisors because he has a thick accent. (*Id.* at 212:25–214:11.)  Chavarria did make conclusory assertions to this effect, but Rauceo did not testify to this.  *See* (*id.* at 214:18–215:7); (Rauceo Ex. 16, Chavarria Dep. Tr. 146:18–148:24).  Counsel could not state *how* Rauceo was treated differently at work, (May 27, 2021 Hr'g Tr. 214:14–17), and the record does not show this either.  Counsel claimed this conduct was pervasive, but she acknowledged it was not severe. (May 27, 2021 Hr'g Tr. 214:2–7, 215:22–216:2.)  She further said McGuire, and possibly Martinez, engaged in the conduct Rauceo complained about, but Rauceo did not report "most things that he was questioned about" to PGW.  (*Id.* at 216:13–19, 217:4–12.)

Though counsel did not claim these events support Rauceo's hostile work environment claim at oral argument, Rauceo's Response to PGW's Motion for Summary Judgment also identifies his exclusion from the pipeline and LNG truck unloading projects and the "Rat Pack" signs as supportive of his hostile work environment claim. *See* (Resp. to Mot. for Summary Judgment 12–13).

Accepting and considering in the light most favorable to him all evidence Rauceo believes could support his claim, no reasonable juror could find Rauceo was subjected to severe or pervasive discriminatory conduct because nothing he alleges had any discernable impact on his employment.  Rauceo earned the most overtime of anyone in his position in 2017 even though he was excluded from the LNG truck unloading and pipeline projects.  No evidence shows the "Rat Pack" signs' fleeting presence functionally transformed Rauceo's job in any way.  And while Rauceo himself does not claim he is treated differently at work because of his accent, even if he was no

reasonable juror could infer that such treatment is sufficiently "extreme to amount to a change in the terms and conditions" of his employment.  *Caver*, 420 F.3d at 262.

C

PGW hired Maurice Goodwin, an African American brown-skinned male, in February of 2012.  (Goodwin Am. Compl. ¶ 10, ECF 8); (PGW Goodwin SUMF ¶ 1, ECF 42-2); (Goodwin Resp. to PGW SUMF ¶¶ 1, 3, ECF 52-2); (Goodwin Ex. 1, Goodwin Dep. Tr. 17:23–18:12, ECF 52-5.)  He currently works as a Senior Process Operator at the Passyunk Plant,  (Goodwin Resp. to PGW SUMF ¶ 3); (Goodwin Dep. Tr. 17:23–18:12), and is a member of Local 686, (PGW Goodwin SUMF ¶ 4); (Goodwin Resp. to PGW SUMF ¶ 4).  PGW interviewed Goodwin on January 11, 2018 as part of its investigation into Chavarria's discrimination complaint.  (PGW Goodwin SUMF ¶ 44); (Goodwin Resp. to PGW SUMF ¶ 44.)  During that interview, Goodwin reported that he believed Working Foreman Michael Tomczak had committed time theft at the Plant.  (PGW Goodwin SUMF ¶¶ 55, 57); (Goodwin Resp. to PGW SUMF ¶ 55, 57.)  This allegation, which matched claims by Chavarria and Ackie, sparked an internal investigation. (Goodwin Ex. 10, Grant Dep. Tr. 118:10–119:21, ECF 52-6.)

Goodwin claims he began experiencing retaliation and hostility following his participation in PGW's investigation.  On February 16, shift supervisor John Mullin instructed Goodwin to pick up trash at the Plant.  (PGW Goodwin SUMF ¶ 70); (Goodwin Resp. to PGW SUMF ¶ 70.)  Goodwin refused and Mullin reported the situation to Martinez.  (PGW Goodwin SUMF ¶¶ 71–72); (Goodwin Resp. to PGW SUMF ¶¶ 71–72.)  Martinez explained to Goodwin that he was being asked specifically to pick up empty salt bags, not miscellaneous trash.  (PGW SUMF ¶¶ 73–74); (Goodwin

24

Resp. to PGW SUMF ¶¶ 73–74.)  Goodwin agreed to pick up salt bags if he saw any. (Goodwin Dep. Tr. 84:7–11.)  Goodwin testified that following this encounter, another employee told Ackie that Martinez wanted Goodwin fired for insubordination.  (*Id.* at 86:18–87:6.)  Ackie then relayed this information to Goodwin.  (*Id.*)  But neither Martinez nor Mullin discussed termination with Goodwin and PGW never disciplined him for this incident.  (*Id.* at 87:7–88:8.)  Nonetheless, Goodwin filed an internal complaint with Matthew Rohrer, PGW's Senior Business Partner in Human Resources, claiming he was told to pick up trash and, when he refused, management tried to fire him.  (Goodwin Ex. 14, Rohrer Dep. Tr. 110:1–14, ECF 52-6.)  Rohrer testified that outside counsel for PGW investigated this complaint and Goodwin never faced any discipline or repercussions from this incident.  (*Id.* at 110:18–21.)

From January to March of 2018, the Passyunk Plant needed Process Operators to perform another truck unloading job.  (PGW Goodwin SUMF ¶¶ 47–48); (Goodwin Resp. to PGW SUMF ¶¶ 47–48.)  Just one month before, the Plant had received Chavarria's complaint about Passyunk employees being overworked and African American and black or brown employees being disproportionately scheduled to perform truck unloading jobs.  (PGW SUMF ¶ 41); (Goodwin Resp. to PGW SUMF ¶ 41.)  So Rohrer suggested that PGW seek volunteers from the Richmond Plant to come to Passyunk to perform the truck unloading job.  (Goodwin Ex. 14, Rohrer Dep. Tr. 198:12–199:9, ECF 56-2.)  From January to March, white Richmond Process Operators Patrick McGlone, Ryan Purcell and Johnny Macomber performed truck unloading at Passyunk, earning overtime some days.  (PGW Goodwin SUMF ¶¶ 48, 51); (Goodwin Resp. to PGW SUMF ¶¶ 48, 51.)  Goodwin and Ackie, who were Process Operators at

Passyunk, were not scheduled to perform this job.  (PGW Goodwin SUMF ¶ 51);

(Goodwin Resp. to PGW SUMF ¶ 51.)  Goodwin testified that he believes PGW made

this decision in retaliation for his participation in the investigation into Chavarria's

internal complaint, not based on his race or color.  (Goodwin Ex. 1 at 127:7–17.)

On February 21, 2018, Goodwin and Ackie requested that union representatives

Mark Gaydosh and Jesse Gil submit a grievance regarding Passyunk's use of the

Richmond employees for truck unloading.  (Local 686 Goodwin SUMF ¶ 8, ECF 41-1);

(Goodwin Resp. to Local 686 SUMF ¶ 8, ECF 50-3.)  The grievance worked its way

through Local 686's process and a committee voted not to send the grievance to

arbitration because, in the committee's view, it could not succeed on its merits.  (Local

686 Goodwin SUMF ¶¶ 10–11); (Goodwin Resp. to Local 686 SUMF ¶¶ 10–11.)

In May of 2018, Goodwin arrived at Passyunk at 9:50 a.m. to begin his shift.

(PGW Goodwin SUMF ¶ 97); (Goodwin Resp. to PGW SUMF ¶ 97.)  He was scheduled

to begin work at 6:00 a.m., but had allegedly received permission to start at 10:00 a.m.

(PGW Goodwin SUMF ¶ 97); (Goodwin Resp. to PGW SUMF ¶ 97.)  Nevertheless, he

received a written warning for being late.  (PGW Goodwin SUMF ¶ 98); (Goodwin Resp.

to PGW SUMF ¶ 98.)  Goodwin filed two grievances against PGW regarding this

warning.  (Local 686 Ex. A, McDonough Affidavit ¶ 19, ECF 41-4.)  The grievance

committee voted to move them to the second step in the grievance process and PGW

agreed to remove the written warning from Goodwin's file, thus resolving both

grievances.  (*Id.* at ¶¶ 20–21); (PGW Ex. DD, Local 686 Contact Memorandum, ECF 42-

5.)  When asked about these grievances, Goodwin testified that Local 686 took action to

protect his interests.  (Local 686 Goodwin Ex. C, Goodwin Dep. Tr. 202:23–203:2, ECF 41-6.)

In June, Debrah DeColli, an Office Manager at Passyunk, went to the Plant library to use a computer.  (PGW Goodwin SUMF ¶ 90); (Goodwin Resp. to PGW SUMF ¶ 90.)  She saw Goodwin in the library and reported to McGuire that he was asleep.  (PGW Goodwin SUMF ¶ 91); (Goodwin Resp. to PGW SUMF ¶ 91.)  At the time, Goodwin was sitting in front of a computer with his shoes off and his feet up on a chair.  (Goodwin Dep. Tr. 101:5–15.)  Goodwin received a written warning for sleeping on the job and he filed another grievance.  *See* (PGW Goodwin SUMF ¶ 94); (Goodwin Resp. to PGW SUMF ¶ 94).  This grievance also followed normal procedures and the committee voted it to the second step of the process on June 14, 2018.  (Local 686 Ex. A ¶ 23.)  Union and PGW representatives met to discuss this grievance but the union was unable to convince PGW to withdraw the written warning and the committee subsequently voted to drop the grievance based on its view that it had no chance of success on its merits.  (*Id.* at ¶¶ 24–25.)  The committee conveyed this information to Goodwin on September 21, 2018.  (*Id.* at ¶ 25.)

On October 3, 2018 Goodwin filed charges with the EEOC and PHRC alleging race and color discrimination at the Passyunk Plant.  (Goodwin Am. Compl. ¶ 4.)  The EEOC issued a right to sue letter on July 2, 2019.  (*Id.* at Ex. A.)  In September of 2019, Goodwin sued PGW and Local 686 for discriminating against him because of his race and color.  (Goodwin Compl., ECF 1.)  He asserted a retaliation claim against PGW and hostile work environment claims against PGW and Local 686.  At oral argument on the

summary judgment motions, his lawyer withdrew Goodwin's hostile work environment claim against the union,[7] so only his claims against PGW remain.

i

PGW moves for summary judgment on both of Goodwin's claims. As it relates to the retaliation claim, the parties agree that Goodwin engaged in protected activity when he participated in PGW's investigation into Chavarria's internal complaint in January of 2018, complained about being asked to pick up trash and when PGW's outside counsel interviewed him in March or April of 2018. (PGW Summary Judgment Mot. 17, ECF 42-1); (Goodwin Resp. 13–14, ECF 52-1.) Goodwin claims he also engaged in protected activity when he filed his grievance regarding PGW using Richmond Plant employees to perform truck unloading. (Goodwin Resp. 14.) PGW argues that, this protected activity notwithstanding, Goodwin suffered no adverse employment actions and, even if he did, he cannot establish a connection between his protected activity and any adverse action.

---

[7]    Goodwin's claim against the union disintegrated with his own deposition testimony. He testified that none of his Local 686 representatives had ever treated him differently based on his race or color. (Local 686 Ex. C at 200:1–201:14.) And he testified that he does not believe the union ever did anything against his interest based on his race or color. (*Id*. at 207:2–11.) Following this deposition, the union sent Goodwin's lawyer a letter requesting that she withdraw his claim against Local 686. (Local 686 Mot. for Sanctions Ex. B, ECF 34-1.) It threatened to move for Rule 11 sanctions if she declined. (*Id*.) But instead of withdrawing the claim, counsel submitted a "sham affidavit" in which Goodwin claims he was afraid to answer questions about race honestly during his deposition and he believes the union treated him differently based on his race and/or color. (Goodwin Resp. to Mot. for Sanctions Ex. 3, ECF 37-4); *see Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."). It isn't plausible that after crossing the Rubicon and suing his employer for racial discrimination Goodwin would then be afraid to testify honestly about racial discrimination.

Goodwin identifies only four purported adverse employment actions in his Response to PGW's Motion: (1) missing out on overtime when PGW used Richmond Process Operators for the truck unloading job; (2) receiving a written warning for arriving late for a shift; (3) receiving a written warning for sleeping on the job; and (4) being subjected to a new vehicle policy at the Passyunk Plant requiring union employees to obtain permission before using Plant vehicles. (*Id.* at 9, 14–15.) At oral argument, counsel focused on the written warnings when asked what adverse employment actions Goodwin experienced as a result of his protected activity. (May 27, 2021 Hr'g Tr. 194:12–14, 196:3–15.) Other than the written warning Goodwin received for sleeping on the job, none of these alleged actions qualify as adverse employment actions because they would not "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & S.F. Ry.*, 548 U.S. at 68.

The June 7, 2018 written warning for sleeping on the job may qualify as an adverse employment action because it was part of a progressive disciplinary policy. *See Rivers v. Potter*, No. 05-cv-4868, 2007 WL 4440880, at *9 (D.N.J. Dec. 18, 2007). When Goodwin received this warning, PGW told him he would be suspended for one day if he violated the corporate policy prohibiting sleeping on the job again within the next twenty-four months. (Local 686 Ex. D, Union Contact Memorandum, ECF 41-7.) But even if this was an adverse employment action, the record does not establish a causal connection between this warning and any of his protected activity. This warning came roughly two months after his last protected activity, so Goodwin does not show "temporal proximity 'unusually suggestive of retaliatory motive.'" *Carvalho-Grevious*, 851 F.3d at 260. And the warning was based on a disinterested employee's report that

she saw him sleeping. *See* (Goodwin Dep. Tr. 105:13–106:3) (Goodwin testifying that he and DeColli did not know each other). Even if Goodwin could establish a connection between his protected activity and this written warning, PGW had a legitimate, non-retaliatory reason for it—another PGW employee reported that she saw Goodwin sleeping in the Plant library and Goodwin's own testimony supported the inference that he had been sleeping. (Goodwin Ex. 1 at 101:5–15) (Goodwin testifying that he was sitting in front of a computer with his shoes off and his feet up on a chair). Goodwin presents no evidence that PGW's explanation for issuing this warning was pretextual. *See Burton*, 707 F.3d at 427.

The other actions Goodwin references do not rise to the level of adverse employment actions. First, the record does not show that PGW's decision to use Richmond employees to perform truck unloading at Passyunk from January to March of 2018 would dissuade a reasonable employee from making a discrimination charge. Again, PGW is contractually obligated to distribute overtime as equitably as possible among union personnel, and Goodwin presents no evidence establishing that he was entitled to the overtime associated with the truck unloading job. Plus, Goodwin earned overtime on other jobs from January to March and, by the end of the fiscal year, accrued more overtime than each of the Richmond employees who performed the truck unloading job at Passyunk. (PGW Ex. J, Weekly Overtime Reports, ECF 42-4.) And even if Goodwin could establish that this was an adverse employment action with a causal connection to his protected activity, PGW offers a legitimate non-discriminatory reason for enlisting help from the Richmond Plant—Chavarria had just complained about Passyunk employees being overworked specifically in relation to a truck

30

unloading job and PGW was trying to alleviate this burden on the Passyunk employees. (PGW Goodwin SUMF ¶ 41); (Goodwin Resp. to PGW SUMF ¶ 41); (Goodwin Ex. 14 at 198:12–199:9.)  Again, Goodwin offers no record evidence showing this justification was pretextual.

The written warning Goodwin received for coming into work at 9:50 a.m. on May 27, 2018 is also not an adverse employment action.  Goodwin does not establish that this warning was "part of a progressive disciplinary policy" or was "inconsistent with [PGW's] disciplinary scheme." *Henley v. Brandywine Hosp., LLC*, No. 18-cv-4520, 2019 WL 3326041, at *11 (E.D. Pa. July 24, 2019).  Plus, PGW withdrew the warning in response to Goodwin's grievance and PGW's receipt of additional information related to Goodwin arriving after his scheduled 6:00 a.m. start time.  (PGW Ex. DD, Union Contact Mem., ECF 42-5.)  Even if this could be considered an adverse employment action—and assuming Goodwin could establish a causal connection between this warning and protected activity—PGW had "a legitimate, non-retaliatory reason for its conduct" because Goodwin arrived nearly four hours late for his shift.  *Moore*, 461 F.3d at 342.  Goodwin presents nothing to show that PGW's purported reason for the warning was false, or "that retaliation was the real reason for the adverse employment action."  *Id.* (citation and quotation marks omitted).

The Passyunk Plant's new vehicle policy, implemented after Goodwin's and others' allegations of time theft at the Plant, was not an adverse employment action either.  Goodwin points to no record evidence to support the claim that this policy change requiring union personnel to obtain permission and sign out company vehicles before using them would have dissuaded a reasonable employee from pursuing a

discrimination charge. *See Daniels*, 776 F.3d at 195.  Even if Goodwin could somehow show that this new policy constituted an adverse employment action, PGW provided a legitimate, non-discriminatory reason for it—Goodwin and others had recently reported time theft involving circumvention of plant checkpoints and PGW changed the vehicle policy to "tighten things up" at the Plant.  (PGW Goodwin SUMF ¶¶ 64–67); (Goodwin Resp. to PGW SUMF ¶¶ 64–67.)  Goodwin's half-hearted rebuttal that this policy disproportionately impacted minority employees comes up short.  *See* (Goodwin Resp. 9).

ii

The record evidence also fails to support Goodwin's hostile work environment claim against PGW.  Goodwin does not show how any of his experiences at PGW constituted intentional discrimination based on his race or color.  As PGW correctly argues, even accepting Goodwin's version of events as true, the totality of the circumstances do not show he was subject to intentional discrimination.  For example, Goodwin testified that he does not believe PGW's decision to use Richmond employees for truck unloading was based on his race or color.  (Goodwin Ex. 1 at 127:7–12.) Neither of Goodwin's two written warnings—for sleeping on the job and arriving late for a shift—support a finding of intentional race or color discrimination either as both were based on bona fide workplace violations.

Even if PGW's actions were based on Goodwin's race or color, nothing he experienced qualifies as severe or pervasive.  Goodwin notes that in addition to the written warnings, he was asked to pick up trash once, feels ostracized at work and has

been denied "call outs."[8]  *See* (Goodwin Ex. 1 at 84:7–11, 112:7–12, 117:15–24).  He does

not show how these one-off or vague references to purported discrimination clear the

"high" threshold for establishing severe or pervasive discrimination.  *Greer*, 590 F.

App'x at 173; *see Woodard*, 255 F. App'x at 610; *King*, 66 F. App'x 305.  To the

contrary, Goodwin describes only "isolated incidents" and patterns of conduct that

cannot be fairly characterized as "severe, threatening, or humiliating."  *Greer*, 590 F.

App'x at 173–74 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per

curiam)).  Being asked to pick up trash, receiving warnings for sleeping on the job and

showing up late, feeling ostracized and being denied call outs are not "objectively

hostile acts that altered the terms and conditions of [his] employment" and do not

establish a "workplace [ ] permeated with discriminatory intimidation, ridicule, and

insult."  *Id.* at 174 (internal quotation marks and citations omitted).  Goodwin may very

well perceive his work environment as hostile, but to establish a *prima facie* claim

under Title VII and the PHRA, he must show that it was "objectively" so.  *Id.* at 173.

He cannot do so on this record.

## D

Dwayne Ackie is an African American black male of Trinidadian descent.  (Ackie

Ex. 1, Ackie Dep. Tr. 10:10–15, 11:8–13, ECF 66-6.)  PGW hired him in March of 2011

and he currently works as a Senior Process Operator at the Passyunk Plant.  (*Id.* at

13:3–5.)  He is also a member of Local 686.  (*Id.* at 13:8–10.)  PGW interviewed Ackie in

---

[8]      Although Goodwin continues to raise the denial of "call outs" as an adverse employment
action, he testified that he cannot recall a single instance when this happened without referencing
written notes that he lost in a fire at his brother's house. (Goodwin Dep. Tr. 14:11–16:18; 110:24–
114:23.)

relation to Chavarria's internal complaint on January 9, 2018.  (PGW Ackie SUMF
¶ 47, ECF 56-2); (Ackie Resp. to PGW SUMF ¶ 47, ECF 66-2.)  When asked, Ackie
claimed to have no information about Tomczak engaging in time theft.  (Ackie Ex. 1 at
150:11–18.)  Nonetheless, Charles Grant, a Senior Vice President at PGW, (PGW Ackie
SUMF ¶ 60), allegedly interviewed Ackie in relation to the time theft claims on
February 16 and 20.  (Ackie Resp. to PGW Mot. for Summary Judgment 5, ECF 66-1.)
Then on February 21, Ackie and Goodwin filed a grievance about PGW's use of
Richmond employees for truck unloading at the Passyunk Plant.  (Local 686 Ackie
SUMF ¶ 7, ECF 55-1); (Ackie Resp. to Local 686 SUMF ¶ 7, ECF 62-2.)  A white
Richmond employee, Johnny Macomber, originally joined this grievance based on
overtime he felt he was missing out on at the Richmond Plant.  (Ackie Resp. to PGW
SUMF ¶ 53); (Ackie Ex. 14, Macomber Dep. Tr. 101:24–102:2, ECF 66-8.)  But—
unbeknownst to Macomber—his name was removed at some point before the union
decided not to advance the grievance to arbitration.  (*Id.* at 104:7–10.)

     On February 23, 2018 while Ackie was working a night shift at the Passyunk
Plant, McGuire came in unannounced and confronted him.  (Ackie Ex. 1 at 35:4–14.)
Ackie testified that McGuire did not announce his presence, broke security protocols
when entering the Plant, was not wearing required personal protective equipment and
"wreak[ed] of alcohol."  (*Id.*)  When McGuire saw Ackie he asked "what the f***" Ackie
was doing and, when Ackie explained he was "taking [his] readings," argued with him.
(*Id.*)  McGuire also accused Ackie of sleeping.  (PGW Ackie SUMF ¶¶ 74–76); (Ackie
Resp. to PGW SUMF ¶¶ 74–76.)  Ackie filed a complaint with PGW about this incident
the following week and Grant interviewed him again.  (Ackie Ex. 1 at 46:16–20, 47:22–

24); (PGW Ackie SUMF ¶ 79.)  PGW suspended McGuire for six weeks pending an

investigation.  (Ackie Ex. 1 at 76:10–14.)  After PGW suspended McGuire, Ackie alleges

he began hearing references to "rats" at the Plant, someone found the "Rat Pack" signs

and his supervisor, Brian O'Donnell, began "stalking" him by "driving around and

parking in areas" where he could see Ackie.  (*Id*. at 76:21–22, 78:6–11, 80:1–4.)[9]

Ackie dual-filed EEOC and PHRA charges against PGW and the union on

August 2, 2018.  (Ackie Sec. Am. Compl. ¶ 4, ECF 19.)  The EEOC issued right to sue

letters on June 26 and June 29, 2019.  (*Id*. at ¶ 5.)  Ackie then sued PGW and Local 686

in September of 2019.  (Ackie Compl., ECF 1.)  He asserts a retaliation claim against

PGW and hostile work environment and disparate treatment claims against PGW and

the union.

i

As it relates to the retaliation claim, the parties agree that Ackie engaged in

protected activity when PGW interviewed him about Chavarria's discrimination

complaint in January and February of 2018, when he filed his February 21 grievance

and when he lodged a complaint against McGuire on February 26.  (May 27, 2021 Hr'g

Tr. 163:7–24.)  At oral argument his lawyer claimed Ackie suffered adverse employment

actions by missing out on overtime when PGW used Richmond Process Operators for

---

[9]       Like Chavarria and Rauceo, Ackie attempts to support his claims with evidence post-dating
the EEOC's investigation of his charge.  PGW again argues the Court cannot consider those
allegations because Ackie has failed to exhaust his administrative remedies for them.  *See* (PGW
Ackie Reply 2–5, ECF 67); *Crumpton*, 305 F. Supp. 2d at 76; *Ryan*, 277 F. Supp. 3d at 594.  As with
Chavarria, PGW is correct, and the Court did not consider those events in deciding PGW's Motion.
And even if it had, the Court agrees with PGW that "none of [the] alleged events . . . even support
[Ackie's] claims or would otherwise be sufficient to withstand PGW's Motion for Summary
Judgment."  (PGW Ackie Reply 4.)

the truck unloading job from January to March of 2018, (*id.* at 164:14–17), and when McGuire came to the Passyunk Plant on February 23 unannounced—allegedly drunk—and confronted Ackie and accused him of sleeping on the job, (*id.* at 164:20–165:13). Ackie raises those two alleged adverse actions in his Response to PGW's Motion as well. (Ackie Resp. to PGW Summary Judgment Mot. 12, ECF 66.)  He also briefly mentions the new vehicle policy at the Passyunk Plant and O'Donnell "stalking" him.  (*Id.* at 7–8, 13.)

As discussed in Section III.C.i. above, PGW scheduling Richmond employees to perform the truck unloading job from January to March of 2018 is not an adverse employment action.  Ackie, like Goodwin, accrued more overtime than the Richmond employees by the end of the fiscal year, (PGW Ex. M, Weekly Overtime Reports, ECF 56-4), and, even if this was an adverse action, PGW had a legitimate, non-discriminatory reason for utilizing the Richmond employees.

McGuire's conduct on the night of February 23 also does not constitute an adverse employment action in the retaliation context.  Although this confrontation was likely uncomfortable and upsetting to Ackie, it is not the sort of encounter that would dissuade a reasonable employee from making or supporting a discrimination charge.  In fact, Ackie reported McGuire's conduct the next business day.  (PGW Ackie SUMF ¶ 78); (Ackie Resp. to PGW SUMF ¶ 78.)  And McGuire did not threaten or discipline Ackie for allegedly sleeping and there is no evidence that McGuire confronted Ackie after that night.  *See Buffa*, 56 F. App'x at 576 (no adverse employment action when employee experienced "intense scrutiny and overly-critical supervision" but "was never

36

threatened with termination, demoted, urged to resign, or asked to assume lesser job responsibilities").

As explained above, the Passyunk Plant's new vehicle policy was not an adverse employment action either.  Like Goodwin, Ackie points to no record evidence to support the claim that this policy would have dissuaded a reasonable employee from pursuing a discrimination charge.  *See Daniels*, 776 F.3d at 195.  And even if Ackie could somehow show that this new policy constituted an adverse employment action, PGW provided a legitimate, non-discriminatory reason for it.  (PGW Ackie SUMF ¶¶ 64–67); (Ackie Resp. to PGW SUMF ¶¶ 64–67.)  Ackie does not show that this reason was pretext for discrimination.

O'Donnell's alleged "stalking" is also not an adverse employment action because, as Ackie acknowledged, O'Donnell is a supervisor tasked with overseeing his work.  (Ackie Ex. 1 at 78:19–24.)  It is entirely reasonable for a supervisor to drive around the Plant and park in areas where he can see the employees he supervises.  As discussed above, this behavior does not rise to the level of an adverse employment action.  *See Boykins*, 78 F. Supp. 2d at 414, *aff'd* 29 F. App'x 100; *see also Buffa*, 56 F. App'x at 576; *Huggins*, 2010 WL 4273317, at *10 n.25.

ii

Ackie also claims PGW intentionally discriminated against him based on his race, color or national origin.  He alleges he suffered adverse employment actions when: (1) PGW management implemented the new vehicle policy; (2) PGW used white Richmond Plant employees to perform truck unloading; (3) McGuire confronted him

and accused him of sleeping on February 23, 2018; (4) O'Donnell "stalked" him; and (5) other unknown employees made comments and posted signs about "rats" at Passyunk. (Ackie Sec. Am. Compl. ¶¶ 40–50, 58–59, 62, 109, 126); *see* (PGW Ackie Mot. for Summary Judgment 6–7). None of these instances rise to the level of an adverse employment action and, even if they did, they did not occur under circumstances giving rise to an inference of discrimination.

First, requiring employees to obtain permission before using Plant vehicles is not a change that altered Ackie's "terms, conditions, or privileges of employment." *Komis*, 918 F.3d at 292. At most, it is a "[m]inor action . . . insufficient to constitute an adverse employment action." *Langley v. Merck & Co.*, 186 F. App'x 258, 260 (3d Cir. 2006). And, as discussed above, even if this was an adverse employment action and Ackie could establish that it occurred under circumstances giving rise to an inference of discrimination, PGW provided a legitimate, non-discriminatory reason for the policy that Ackie does not show was a pretext for discrimination.

Second, Ackie says PGW altered his "compensation, terms, conditions and privileges of employment under the CBA" by bringing in white employees for truck unloading from January to March of 2018 and not staffing him on the job. (Ackie Resp. to PGW Summary Judgment Mot. 14.) But, like Goodwin, Ackie earned more overtime than those Richmond employees by the end of the fiscal year and he cannot show he was entitled to the truck unloading work. (PGW Ackie Ex. M.) And as discussed above, even if Ackie could establish a *prima facie* claim for the truck unloading job, PGW had a legitimate, non-discriminatory reason for staffing this job with Richmond employees— Chavarria had just complained about the Passyunk employees being overworked

38

specifically in relation to a truck unloading job. Ackie does not point to evidence showing this reason for using Richmond employees for truck unloading was pretextual.

Third, McGuire coming into the Plant on February 23—allegedly drunk—and questioning Ackie, cursing at him and accusing him of sleeping on the job was not an adverse employment action. Being questioned and cursed at by a manager you believe to be drunk is an unpleasant experience no employee should have to endure. But "mere 'unpleasantness' in the workplace does not constitute an adverse employment action." *Taylor v. Brennan*, No. 15-cv-2349, 2016 WL 192610, at *5 (E.D. Pa. Jan. 15, 2016). McGuire's conduct was not so severe as to alter the conditions or terms of Ackie's employment and, although he accused Ackie of sleeping, nothing ever came of that accusation. McGuire's actions on February 23 therefore do not rise to the level of an adverse employment action. *See Kwaning v. Community Education Centers, Inc.*, No. 15-cv-928, 2015 WL 6964283, at *6 (E.D. Pa. Nov. 10, 2015) (correctional officer did not suffer adverse employment action when his sergeant "threatened his job for 'not understanding the English language'").

iii

Next, Ackie claims Local 686 discriminated against him based on his race, color or national origin. This claim "founders on the very first prong" because Ackie does not establish a violation of the collective bargaining agreement. (Local 686 Mot. for Summary Judgment 9, ECF 55-1.) He claims Local 686 violated the CBA's non-discrimination clause by failing "to advance discrimination as the basis for the grievance" regarding the truck unloading job. (*Id.* at 6); (May 27, 2021 Hr'g Tr. 180:13–181:21, 189:16–25.) But nothing in the record supports this claim. At oral argument,

the Court asked counsel whether evidence in the record could show that Ackie asked

Local 686 to pursue that grievance based on discrimination.  (May 27, 2021 Hr'g Tr.

188:19–21.)  She pointed only to Ackie's deposition testimony where he vaguely claims

that his union representative treated him differently based on his race by not "help[ing]

us or set[ting] us in the right direction" in relation to "[m]anagement with the

discriminatory stuff."  (*Id.* at 188:22–23 (citing Local 686 Ex. C, Ackie Dep. Tr. 164:23–

166:8, ECF 55-6.))  No juror could reasonably conclude from that vague self-serving

allegation that Local 686 violated the CBA or that it did so based on Ackie's race, color

or national origin.

To the extent Ackie also alleges that Local 686 discriminated against him by

denying him overtime from the truck unloading job or with regards to Macomber's

name being removed from his grievance, those claims fail as well.  As an initial matter,

PGW, not Local 686, decided to utilize Richmond Plant employees for the unloading job.

That fact aside, Ackie fails to show that he was entitled to overtime from the truck

unloading job.  And by the end of the fiscal year he had actually earned more overtime

than the Richmond employees who performed the unloading job.[10]  And finally, Ackie

fails to establish that removing Macomber's name from his grievance violated the CBA

or otherwise was discriminatory based on his race, color or national origin.  At his

deposition, Ackie testified that he had no evidence supporting the belief that removing

Macomber's name had any impact on his grievance.  (Local 686 Ex. C at 129:11–14.)

---

[10]     Ackie's Response to Local 686's summary judgment Motion also contradicts any claim that
PGW brought in white Richmond employees to discriminate against Ackie based on his race, color or
national origin.  Ackie specifically alleges PGW enlisted those employees as *retaliation* for his
involvement in the Chavarria investigation.  (Resp. to Local 686 Mot. for Summary Judgment. 6.)

iv

Ackie also asserts a hostile work environment claim against PGW.  This claim

fails, as an initial matter, because he does not establish that he suffered intentional

discrimination based on his race, color or national origin.  *See In re Tribune Media Co.*,

902 F.3d at 399.  But even if he could show discrimination, nothing he alleges reaches

the level of severe or pervasive necessary to support a hostile work environment claim.

*See Caver*, 420 F.3d at 262.

At oral argument, counsel claimed McGuire's conduct coming into the Plant after

hours supported Ackie's claim of severe or pervasive discrimination.  (May 27, 2021

Hr'g Tr. 175:4–8.)  She also vaguely claimed a severe or pervasive discriminatory

environment based on "[t]he whole environment regarding this White friend group," (*id.*

at 176:24–25), and Macomber's testimony that he stepped into a "race situation" when

he came to Passyunk from Richmond, (*id.* at 177:16–20).  She also referenced the "Rat

Pack" signs in support of Ackie's hostile work environment claim.  (*Id.* at 178:25–179:6.)

None of these allegations establish a *prima facie* hostile work environment claim.

As explained above, McGuire's conduct on the night of February 23 does not

support a finding of intentional discrimination based on Ackie's race, color or national

origin.  But even if it did, this isolated incident did not "unreasonably interfere[] with

[Ackie's] work performance," *Caver*, 420 F.3d at 262–63, "amount to a change in the

terms and conditions of [his] employment," *id.* at 262, and was not "severe, threatening,

or humiliating," *Greer*, 590 F. App'x at 173–74; *see Hegyes v. U.S. Steel Corp.*, No. 04-cv-

1283, 2007 WL 218711, at *17 (W.D. Pa. Jan. 25, 2007) (no severe or pervasive

discrimination from "hand full [sic] of isolated incidents" involving "unfounded

discipline . . .yelling [and] swearing"). Isolated incidents like this must be "extremely severe" to establish a hostile work environment. *Ballard-Carter v. Vanguard Group, Inc.*, No. 15-cv-5370, 2016 WL 3997059, at *8 (E.D. Pa. July 26, 2016) (citation omitted). This confrontation does not meet that standard. *See id.* ("[E]pisodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment.") (citation omitted). The record shows that McGuire did not make any other unannounced visits to the Plant or follow up on his accusation that Ackie was sleeping on the job.

Similarly, there is no evidence from which a reasonable juror could conclude that the "Rat Pack" signs were intended to address Ackie's race, color or national origin or that his allegations of a "White friend group" and a "race situation" at the Passyunk Plant establish that he suffered intentional discrimination. But again, even if the Court accepts that these allegations establish intentional discrimination, they fall far short of being severe or pervasive for purposes of Ackie's hostile work environment claim. *See Woodard*, 255 F. App'x at 610; *King*, 66 F. App'x at 305.

Taken together the alleged instances of discrimination Ackie cites as supporting his hostile work environment claim do not paint a picture of a "work environment [ ] so pervaded by racial harassment as to alter the terms and conditions of his employment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 768 (1998).

v

Ackie's hostile work environment claim against Local 686 also fails. To establish such a claim, Ackie must first show that he was subject to a hostile work environment.

As explained above, he has not done so.  But even if he did, he does not establish that he requested action on the part of the union and that it ignored his request.  *See Robinson*, 2019 WL 3310333, at *22.

Ackie seems to base this claim solely on his assertion that Local 686 erroneously removed Macomber's name from his grievance regarding the truck unloading job and failed to advance discrimination as the basis for that grievance.  (Ackie Sec. Am. Compl. ¶¶ 67, 72, 77–78.)  As already discussed, nothing in the record supports Ackie's contention that he requested that the union advance discrimination as the basis for his grievance.  And whether or not the union removed Macomber's name from that grievance is irrelevant to the questions of whether Ackie "requested action on the part of the union" and whether "the union ignored his request."  *Id.*  As Ackie testified, he has no evidence showing that removing Macomber's name had any impact on his grievance.  (Local 686 Ex. C at 129:11–14.)

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.

43